Estate of Isaac Brownfield, deceased.   Appeal of William W. and Isaac H. Brownfield.

*Will—Family settlement—Confidential relation.*

Testator devised land to his two sons, naming them as executors, but desired them to pay to each of his four daughters "a sum of money equal to the sixth part of the value of the coal under all my lands; my executors to have the power to carry out this provision of this my will by selling if necessary the whole or any part of the said coal if they should consider that the best way to carry the same into effect, but this does not require them to sell the same unless they wish to do so." Testator died shortly after making his will, and a few months after his death his children met and executed a formal sealed agreement fixing the value of the shares of coal at $13,000 each.  The daughters understood the agreement. The sons made no misrepresentations to them, and the testimony was evenly balanced as to whether one of the sons had information of the value of coal which he did not disclose.  Letters testamentary were not taken out by the sons, until three years after testator's death, and their account was filed four years after his death, the coal by that time having increased largely in value.  The auditor appointed to pass on exceptions to the account fixed the value of the shares at $15,500, adding, "This is a higher price than any of the coal in the neighborhood had sold for up to that time." *Held*, (1) that the will did not give the daughters any estate or interest in the coal, but merely a money legacy, the amount of which was to be determined by the value of the coal; (2) that in ascertaining and fixing the valuation of the coal the executors acted so far in a trust relation that the equity rules as to transactions between trustee and cestui que trust required entire good faith on their part; (3) that, as the evidence showed the valuation fixed by the agreement was a fair one, there was no fraud or bad faith on the part of the executors, and it was error for the court below to set aside the family settlement, and to surcharge the accountants with amounts in excess of those fixed by the agreement.

Argued May 8, 1899.   Appeal, No. 279, Jan. T., 1898, by William W. and Isaac H. Brownfield, from decree of O. C. Fayette Co., Sept. T., 1895, No. 40, dismissing exceptions to auditor's report.   Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and DEAN, JJ.   Reversed.

Exceptions to auditor's report.

The auditor, W. A. Hogg, Esq., reported as follows:
Isaac Brownfield died in South Union township, Fayette

county, Pa., on September 11, 1890, possessed of the home farm upon which he resided, and which was underlaid with the vein of Connellsville coking coal. By his will, which was duly probated on May 19, 1894, he devises the home farm to his sons, Isaac and William, and he also appointed the same two sons executors of his will; and in his will, he directed that his executors should pay to each of his four daughters, Jane, Malinda and Elizabeth Brownfield, and Anna B. Crossland, a sum of money equal to one-sixth part of the value of the coal under the said farm, and he authorizes his executors to sell the coal for this purpose if they wish to do so; and he directed his executors to invest and retain control of the bequest to his daughter, Anna B. Crossland.

On March 3, 1891, the six children of Isaac Brownfield executed an agreement among themselves, . . . . by which Anna and Malinda agreed to settle, and accept the sum of $13,000 as the amount of the legacy due them as the one sixth of the value of the coal. The executors subsequently arranged for the sale of the coal under the home farm to Halleck G. Baldridge for the sum of $187,000. The said Halleck G. Baldridge, in order to complete his title, requested that the deed should be made to him by all the heirs of Isaac Brownfield; and on August 18, 1894, this deed was made by the heirs of Isaac Brownfield, to Halleck G. Baldridge, for the consideration of $187,000, and being all the coal owned by said estate, under said land.

William and Isaac Brownfield, on August 5, 1895, filed their account, as executors of Isaac Brownfield, deceased, and on the same day filed their account, as trustees of Malinda Brownfield. In the executor's account, the accountants do not charge themselves with the bequest of the one sixth of the value of the coal; but in their account, as trustees of Malinda Brownfield, they charge themselves with this bequest, at the sum of $13,000. On September 13, 1895, Malinda Brownfield filed exceptions to this account of the trustees, and I have been appointed auditor to pass upon these exceptions, and to restate said account if necessary.

The first exception is that the accountants should have charged themselves with the one sixth of $187,000, which was the sum for which Isaac and William Brownfield sold the coal to Halleck G. Baldridge, instead of charging themselves with $13,000,

as provided by the agreement of March 3, 1891. . . . The exceptant claims that this agreement is invalid, for the reason that it is made between the accountants and their cestui que trust. The accountants, in their account as executors, have not charged themselves with, or accounted for the bequests of one sixth the value of the coal to each of the daughters, but they have filed separate accounts, as trustees of Anna B. Crossland and Malinda Brownfield, in each of which they charge themselves with this legacy at $13,000.

Whether the bequest to Malinda Brownfield was accounted for in the general executors' account, or in this separate trustees' account, the fund is the same, and the powers and duties of the accountants are the same. The bequest is provided by the will, and the accountants are authorized by the will to sell the coal, if necessary, to pay it, and the account itself purports to be an account by trustees under the will of Isaac Brownfield, deceased; and I have found that the relation of trustee and cestui que trust existed between the accountants and Malinda Brownfield at the time the agreement of March 3, 1891, was made. It is true the will had not yet been probated, or letters testamentary issued to the executors when the agreement was made, but the will was put in force by the death of the testator, and the accountants were invested with the powers given them by the will. . . . The agreement itself recognizes them as executors by providing that, as executors, they should accept the valuation at $13,000, and as such executors perform other duties provided for in the agreement. If this agreement of March 3, 1891, would be illegal after the will was probated and letters issued, it would not do to hold that the executors could make an agreement valid that would otherwise have been invalid, by delaying the probate of the will until after the execution of the agreement, and I have considered the accountants trustees, just as if the will had been probated, and letters testamentary were issued to them.

This brings us to the question whether under the terms of the will, creating them trustees, the accountants could make the agreement of March 3, 1891. It has been argued before the auditor that this is only a partial account. The account is stated in its title to be a "first account," but in the trustees' account, which is virtually part of the executors' account, this

legacy is brought into the account, and the dispute is only as to the amount. When an accountant brings a matter into an account, even if only a partial account, it is subject to exception and surcharge: Shindel's Appeal, 57 Pa. 43; Galloway's Estate, 5 Pa. Superior Ct. 272. The case before us must be distinguished from that class of cases, where the trustee, being in control of the estate, buys up outside claims against the estate, and then attempts to collect them against the estate for the individual gain of the trustee. Such is the case in Woods v. Irwin, 163 Pa. 413. In this case, Mrs. N. Adaline Irwin was executrix of Ninian Irwin, deceased, and after the death of Ninian Irwin, she became the owner of a claim for $15,000, by paying therefor the sum of $1,000, which claim had existed against the estate before the death of Ninian Irwin. It was here held that this claim against the estate was void for all over the sum of $1,000. Dilworth's Appeal, 108 Pa. 92, and many other cases cited are where the trustees buy up outside claims against the estate for which they are trustees. These cases, however, are to be distinguished from cases where the trustees make contracts with the cestui que trust himself, and the case before us is of this class. The contract alleged to be invalid was made between the accountants and Malinda Brownfield et al. It is true that where trustees make contracts with their cestui que trust, they are held to a much stricter rule than when dealing with other persons with whom this relationship does not exist. The trustees are bound to act to the utmost good faith in making the contract, and cannot use the powers of their office against the interest of the parties for whom they are trustee. . . . Malinda Brownfield testified that the agreement was not requested by herself; that the executors desired to pay her some interest on her share in the estate; that they had told her not to talk to any one about it; that it was not her understanding that she was selling or fixing the value of her interest, but only arranging for the payment of interest to her; that she had no conversation with her trustees relative to the making of this agreement before it was brought to her, and she did not know it was being prepared at all; that she did not know that by signing the agreement she was selling her interest in the coal; that the only reason given by the executors was that they wished to pay her part of the interest; that the executors

had never advised her to consult any person in regard to the agreement. Mrs. Anna B. Crossland testified to substantially the same facts as Malinda Brownfield.

Against this evidence, Isaac H. Brownfield testifies that Mrs. Crossland and Malinda Brownfield first mentioned to him the subject of such an agreement, for the purpose of getting her interest in the estate in such shape that it would bring her an income; that he told her before the agreement was signed, to go to an attorney, or any other friend she wished, for advice; that he showed her the agreement of March 3, 1891, the night before it was signed, and she read it; that he never said to her not to talk of the agreement, but gave her contrary advice; that there was no understanding or agreement that she would receive more than the $13,000; that the agreement was talked of before it was signed, and thoroughly understood. William Brownfield testified that the agreement of March 3, 1891, was made because Mrs. Crossland and Malinda Brownfield wanted the money from the estate; that they asked the executors what they would give for their interests; that the subject was talked over with Mrs. Anna B. Crossland and Malinda Brownfield several times before the agreement was signed; that he told them to see an attorney, or any one they wished to see for advice. . . . Both Anna and Malinda testified that the accountants requested and advised them not to consult outside parties before signing, while both accountants testify that, on the contrary, they advised their sisters to consult some outside person, or attorney, before signing. Jane and Elizabeth are disinterested witnesses, and they say they heard their brothers advise Anna and Malinda to consult outside parties. . . . The preponderance of the testimony, both as to number of witnesses and their apparent clearness of memory, is that the brothers advised Anna and Malinda to obtain outside advice, and I find as a fact that the accountants did not attempt to conceal the effect of the agreement from their sisters, but advised them to obtain outside advice. The agreement itself is drawn in plain words, and its meaning is clear, and any one of the intelligence and education of the exceptants could scarcely read the agreement without understanding its meaning. Malinda Brownfield testifies that she saw the agreement before the time at which she signed it, and had read parts of it before signing

it. Miss Jane Brownfield and Elizabeth Brownfield testify that the exceptants were given an opportunity to read the agreement, and I find as a fact that the accountants gave the exceptants opportunity to examine the agreement of March 3, 1891. The exceptants testify, however, very positively that they did not know, and never knew, that by the agreement they were fixing the value of their legacy, or, as they seem to have considered it, their interest in the farm, by the agreement, but that they thought they were only arranging for income to themselves, from the estate. . . . It was testified to, however, that Malinda Brownfield considered over a night, as to whether to sign as Elizabeth and Jane, or as Anna. The difference between them in the agreement was that the first two were not fixing the valuation, or selling, while Anna was fixing the valuation for final settlement, or payment.

The fact that Anna Crossland and Malinda Brownfield joined in the deed to Halleck G. Baldridge does not show the intention of the parties at that time, or what was their prior intention. In any event, the purchasers would desire this deed to protect them against contingencies, and in any event, the daughters would probably sign. All sisters did sign alike. Both the ones that had fixed the valuation by the agreement and the ones who had not. I have found as a fact that at the time the agreement of March 3, 1891, was signed, the parties knew its contents.

I have next taken up the amount of coal, and I have considered this the most important fact outside of the actual misrepresentations claimed to have been made by the trustees. . . . I have found as a fact that the executors made no misrepresentations to Mrs. Crossland and Malinda Brownfield as to the amount of the coal, but that they did not inform them of the amount of coal under the land, and that, while there were about 233 acres of coal, Anna and Malinda thought there was coal under part of the original tract of less than 100 acres. I do not find the executors in any way misrepresented the amount of this coal to their sisters, or intentionally concealed it from them, but that they had information as to the amount of coal under the land; that this information was essential to safely enter into this contract of March 3, 1891; that the exceptants did not have this information; that the executors failed to

impart this information to their cestuis que trust, and they made the agreement without knowing the amount, or the approximate amount, of the coal. In this respect the executors or trustees failed to fulfil the conditions required for a valid contract between trustees and their cestuis que trust, and I have, therefore, found that the agreement of March 3, 1891, is not a valid agreement.

If this agreement is invalid, we must then determine the amount of this legacy of one sixth of the value of the coal outside of the agreement, and this can only be done by determining the value of the coal from the testimony. In considering this question, it is first necessary to fix the date at which the one sixth of the value of the coal shall be determined. The will bequeaths the coal absolutely to the sons, William W. and Isaac, and the daughters have no property in the coal, but they have the bequest of a sum of money equal to the one-sixth part of the value of the coal under the land.

It is a well-known general rule that wills go into effect as to the date of the death of the testator, but in fixing values of bequests, it has been held that the will is to be considered as to the date of the will. . . . I have, therefore, considered the value of the coal as of September, 1890. It is well known, and is brought out in the testimony, that prior to the years 1890 and 1891, the coal in the southern end of the county, and in the vicinity of the Brownfield coal, was not considered as good coking coal as that farther north, or, as it is spoken of in the testimony, north of the pike. The large coal and coke operators were then just entering the coal fields in the southern end of the county, and this coal more than doubled its value in a short time. As the witness now sees the situation, he knows that the coal had the inherent value in the year 1890, and only needed to be held to get the large prices of later years. But in 1890 the coal in this locality seems to have been selling from $250 to $400 per acre. Men who had money and were purchasing coal were not paying over this sum for coal. People did not have the information of later developments upon which to form their opinions. . . . Mr. Thompson estimated the coal at that time (testator's death) as worth $400 per acre. This is a higher price than any of the coal in the neighborhood had sold for up to that time, so far as shown by the testimony, and the

· witnesses spoke of a number of sales of coal, made in that locality prior to September, 1890, for prices ranging under $400 per acre. I have found the value of the coal in September, 1890, to have been $400 per acre. . . .

I have charged the accountants with one sixth the value of 233 acres of coal at $400 per acre, or $15,533.33.

The second exception is to the proper amount of interest due the exceptant on this legacy. It is the general rule that legacies bear interest from one year after the death of the testator. If the executors were unable to invest the funds, or were unable to invest them at six per cent, they would not be charged for interest they could not have the fund earn; but there was no testimony of this kind. The executors paid Malinda Brownfield six per cent interest for some time. I have therefore charged the executors with interest at six per cent, from September 11, 1892, to August 31, 1895, the date to which they charged themselves with interest in their account filed, which amounts to $2,769.

The third exception is to the allowance of a credit of $200 for attorney fees paid to Edward Campbell, attorney for accountants. If the estate of Malinda Brownfield had been a separate estate, $200 would be a reasonable fee, but Malinda Brownfield is only a legatee of Isaac Brownfield, deceased, and I cannot see that her legacy should be treated as a separate estate, but this legacy is a part of the estate of Isaac Brownfield, deceased. Exceptions have been filed to this being stated as a separate account and a separate estate, which exceptions I have sustained, and I have considered that in the Isaac Brownfield estate comprising the general executors' account filed, and also this legacy of Malinda Brownfield, $300 is a reasonable fee, and at the same time, one fully earned by the attorney for the executors. There has been a great deal of time, work and responsibility required of the executors' attorney, in this estate, and if this fee is somewhat above the minimum charges of the fee bill, it is justified by the litigation attending the settlement of the estate. I have placed the attorney's fees at $300 in the Isaac Brownfield estate, including this legacy to Malinda Brownfield, and I have charged $100 to this estate and $200 to the executors' account.

I have next taken up the fifth exception, which is that "the

accountants are not testamentary trustees of the said Malinda Brownfield."

The will of Isaac Brownfield, deceased, bequeaths to Malinda Brownfield certain interest in his estate, and also a bequest of one sixth of the value of the coal, and appoints the accountants executors of the will. The accountants, being executors, occupy the position of trustees for the estate, but they are not authorized to manage or control, or act as trustees for Malinda Brownfield, as they are for Anna B. Crossland, and this legacy of Malinda Brownfield is part of the estate of Isaac Brownfield, and should be accounted for as a part of his estate. I cannot see, however, how it in any way prejudices her that a separate account of her legacy was filed, except to the cost of account, and the accountants themselves have charged no commissions in the account in the Malinda Brownfield estate, and I have considered and charged the attorney's fees as part of the Isaac Brownfield estate. The accountants, in their account in the Malinda Brownfield estate, have termed themselves as trustees under the will of Isaac Brownfield, deceased, and the account shows that it is the legacy of Malinda Brownfield under the will of Isaac Brownfield, deceased, which is accounted for, and I have taken the account as part of or supplementary to the executors' general account in the estate of Isaac Brownfield, deceased.

The court dismissed exceptions to the auditor's report.

*Errors assigned* were in dismissing exceptions to auditor's report.

*Edward Campbell,* for appellants.—It is the duty of the court to sustain and enforce the contract of March 3, 1891, against Mrs. Crossland and Malinda Brownfield: Brown v. Cowell, 116 Mass. 461; Farnam v. Brooks, 9 Pick. 212; Perry on Trusts, sec. 195; Bigelow on Fraud, p. 318; Woodhouse v. Meredith, 1 Jacob & Walker, 222; Mason v. Martin, 4 Md. 124; May on Fraudulent Conveyancing (2d ed.), 507; Kerr on Fraud & Mistake (2d ed.), 332; Ridgway v. Newstead, 3 De Gex, Fisher & Jones, 483; Lewin on Trusts, 637; Hale v. Aaron, 77 N. C. 371; Spencer & Newbold's App., 80 Pa. 317; Miggett's App., 109 Pa. 520; Eldridge v. Smith, 34

Vt. 484; Robins's Est., 180 Pa. 630; Rice v. Bixler, 1 Watts & Serg. 445; Chamberlain v. McClurg, 8 Watts & Serg. 31; Paxson v. Hewson, 8 W. N. C. 197; Share v. Anderson, 7 S. & R. 62; Barton v. Wells, 5 Wharton, 225; Smith v. Warden, 7 Harris, 430; Worrall's Accounts, 5 W. & S. 111; Ackla v. Ackla, 6 Pa. 232; Fulton v. Moore, 25 Pa. 476; Walworth v. Abel, 52 Pa. 370.

Courts uphold such settlements as this under rules altogether different from the rules governing contracts between strangers, or between creditors and debtors: Williams v. Williams, L. R. 2 Ch. App. Cases, 294; Williams v. Williams, Brett's Leading Cases in Equity, 320; May on Fraudulent Conveyancing, 272; Stub v. Lies, 6 Watts, 48; Shartel's App., 64 Pa. 25; Burkholder's App., 105 Pa. 31; Wilen's App., 105 Pa. 121; Weaver v. Roth, 105 Pa. 408; Palethorp's Est., 168 Pa. 98; Follmer's App., 37 Pa. 121; Wistar's App., 80 Pa. 484; Johnson's Est., 20 Phila. 22; Pullen v. Ready, 2 Atk. 587; Bispham's Eq. sec. 189.

If the decisions of the courts are to be any guide to the correct transaction of business, a lawyer ought surely to be on solid ground in advising William and Isaac Brownfield that the agreement of March 3, 1891, is not now questionable by Malinda Brownfield or Mrs. Crossland: Deardorff's App., 6 Watts, 159–161; Ashhurst's App., 60 Pa. 290; Miggett's App., 109 Pa. 520; Bispham's Equity (3d ed.), sec. 259; Spencer & Newbold's App., 80 Pa. 317; 1 Perry on Trusts, sec. 205; Bruch v. Lantz, 2 Rawle, 392; Pennock's App., 14 Pa. 446; Fox v. Mackreth, 1 Leading Cases in Equity (White & Tudor), 115; 2 Lewin on Trusts, 644, 497; Morse v. Royal, 12 Vesey, 358.

*S. E. Ewing*, with him *George H. Lepper*, for appellees.

OPINION BY MR. JUSTICE MITCHELL, October 6, 1899:

The testator devised his land to his two sons, also naming them as executors, but desired them "to pay to each of my daughters, Jane, Malinda, Elizabeth and Anna Crossland, a sum of money equal to the sixth part of the value of the coal under all my lands; my executors to have power to carry out this provision of this my will, by selling if necessary the whole or

any part of the said coal if they should consider that the best way to carry the same into effect, but this does not require them to sell the same unless they wish to do so." The effect of this provision, as correctly held by the learned auditor and court below, was not to give the daughters any estate or interest in the coal, but merely a money legacy, the amount of which was to be determined by the value of the coal. The moment that value was liquidated in any valid way, the coal ceased to be a factor in the matter. And the value was to be estimated as of the date of the will or of testator's death, which was so soon after as to be for this purpose contemporaneous. There was no direction to sell, or obligation on the part of the executors to do so. The power to sell was merely a tentative mode of fixing the value, suggested by the testator, but left entirely to the discretion of the executors.

The testator died in September, 1890. In November the six children met and made an amicable division of the personal property which the will had left to them in equal shares, and in March, 1891, they met again and executed a formal sealed agreement of liquidation of the value of the coal, so far as it affected the amount of the legacies to Malinda Brownfield and Anna B. Crossland, two of the daughters. The validity of this agreement is the main question in the case.

The auditor found as facts that the agreement was executed by the two daughters now objecting, with knowledge of its contents; that they had opportunity to examine and consider it before signing; that the accountants, the two sons, made no attempt to conceal the effect of the agreement from their sisters, but advised them to obtain outside advice; that they did not in any way misrepresent the amount of coal, but that one of them had information upon that subject which he did not communicate; and that such information being essential to the safe entry into the agreement the failure to communicate it, under the confidential and fiduciary relations between the parties, rendered the agreement invalid. He thereupon proceeded to take testimony as to the amount and value of the coal, and to surcharge the accountants with this valuation in place of that fixed by the agreement.

The relation of the parties was somewhat exceptional. The sons were devisees of the land, including the coal, and as the

daughters had no estate, title or interest in the coal, but merely a claim for money against the executors depending upon the value of the coal, the sons as owners of the land occupied no fiduciary relation at all to their sisters, and were entitled to deal on this subject at arm's length. But the sons were also named by the testator as executors, though the will had not yet been proved, nor was it offered for probate till three years later, at the instance of the purchaser of the coal. The reasons for this delay are not very clear, but it was certainly in pursuance of an amicable family understanding if not of positive agreement. It is argued by the present appellants that not having yet taken out letters testamentary they were not in any relation of trust or confidence at all at that time. But the auditor was clearly right in holding that the parties dealt on the understanding that the will gave the sons as executors the power and duty to ascertain and fix the value of the coal as the measure of the daughters' legacies, and they were therefore so far in a trust relation that the equity rules as to transactions between trustee and cestui que trust had a bearing on the case. But he erred in applying the rule too strictly. There was no purchase of trust property by the trustee, no strict relation of trust which gave either superior knowledge or power of moral coercion, but there was a confidential relation requiring entire good faith. Not only was this clearly present but the valuation is shown to have been a reasonably fair one, by that which the auditor himself arrived at. The agreement put the valuation at $13,000 for each share; the auditor, after full adverse investigation, with the light of four years' subsequent developments in the coal business, put it at $15,500, coupled with the admission that " this is a higher price than any of the coal in the neighborhood had sold for up to that time."

The agreement was entered into as a family settlement, was carried out without objection for four years, and until the sale of the coal under an unprecedented rise in price made the objectors regret that they had not waited as the others had, to realize on their legacies. In the entire absence of fraud or any act of bad faith, and in view of the clear proof of knowledge by the objectors before execution, the double position of the appellants, one of which carried no duty at all of disclosure of facts, the very evenly balanced testimony whether or not the

brothers had any undisclosed knowledge, the evidence that the valuation was in fact a fair one, and the very strong presumption in favor of a family settlement unimpeached for four years, it was error to set aside the agreement of 1891.

The facts of this case as already said are exceptional and no close precedent has been found, but Grim's Appeal, 105 Pa. 375, is analogous, and the principles as applied there are applicable here.

The agreement of 1891 being valid and the proper basis of the account, the interest must of course be adjusted in accordance therewith, and not at six per cent prior to the sale as the auditor calculated it.

The counsel fees claimed by the accountants appear to us moderate, but they have been slightly reduced by the auditor and the court, and we are without evidence on which we can say there was error in this respect.

The decree is reversed and the account directed to be restated in accordance with this opinion. Costs to be paid by the appellees.